J-A03043-16

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| IT'S ALL WIRELESS, INC. | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellee | |
| v. | |
| DAVID FISHER | |
| Appellant | No. 2116 EDA 2015 |

Appeal from the Judgment Entered August 3, 2015
In the Court of Common Pleas of Philadelphia County
Civil Division at No(s): June Term, 2012, No. 3874

BEFORE:  GANTMAN, P.J., MUNDY, J., and DUBOW, J.

MEMORANDUM BY GANTMAN, P.J.:                **FILED SEPTEMBER 23, 2016**

Appellant, David Fisher ("Mr. Fisher"), appeals from the judgment entered in the Philadelphia County Court of Common Pleas, in favor of Appellee, It's All Wireless, Inc. ("IAW"), in this civil action for breach of contract, tortious interference with contractual relations, civil conspiracy, and theft/conversion.  We affirm.

In its January 23, 2015 Findings of Fact and Conclusions of Law, the trial court accurately set forth the relevant facts of this case as follows:

**Findings of Fact**

**Parties**

1.      Plaintiff [IAW], trading as Pro Mobile Gear ("PMG"), is a Pennsylvania corporation with a place of business in Philadelphia, Pa.  [IAW] is a wholesaler of electronic goods.

2.      Defendant [Mr.] Fisher…is an individual residing at 86 Lilly Drive, Feasterville, Pa.

**Background**

3.      In 2006, [Mr.] Fisher and Stuart Lacheen ("[Mr.] Lacheen"), President of [IAW], discussed the possibility of starting an accessory business within [Mr.] Lacheen's existing business, Digital Communications Warehouse ("DCW").

4.      As a result of these discussions, [Mr.] Lacheen took the name Pro Mobile Gear from [Mr.] Fisher and his business partner, Howard Beloff, and hired [Mr.] Fisher and [Mr.] Beloff.

5.      [Mr.] Fisher was employed by DCW to sell Bluetooth headsets and accessories, as well as other wireless accessories and Apple products.

**[Mr.] Fisher's Employment with DCW and [IAW]**

6.      [Mr.] Fisher began working for DCW in March 2006.

7.      In September 2009, DCW's business operations ceased.  All of its employees, including [Mr.] Fisher, were transitioned to be employees of [IAW, trading as PMG].

8.      When [Mr.] Fisher began working for DCW in March 2006, he signed a Corporate Policy Acknowledgment, which stated that he was entering into an "employment relationship" with DCW.

9.      [Mr.] Fisher also signed a second "Corporate Policy Acknowledgment" in March 2006, which stated that he understood that DCW's "customers and dealers and customer and dealer lists are proprietary" and that he agreed not to solicit the company's customers or dealers for a period of one year after the termination of his employment with DCW.

10.      In October 2009, [IAW] formally began to exist.

11. On October 16, 2009, [Mr.] Fisher signed a substantially similar Corporate Policy Acknowledgment.

12. The 2009 Acknowledgment again acknowledges that [Mr.] Fisher had an "employment relationship with [IAW], or its affiliates."

13. The 2009 Acknowledgment also states that [Mr.] Fisher understood that "the Company's customers and dealer lists are confidential and proprietary" and that he agreed and covenanted not to solicit the Company's customers or dealers for a period of one year after the termination of his employment with [IAW].

14. The 2009 Acknowledgment further stated that [Mr.] Fisher agreed with the statement, "the term 'employee' refers to all individuals who are required by law to receive W2s or 1099s."

15. At the time [Mr.] Fisher signed the Acknowledgment in 2009, he also filled out an employee personal information form, signed an employee acknowledgment of [IAW's] sexual harassment policy, and signed a consent to drug and alcohol screening.

16. [Mr.] Fisher held himself out to be an employee of [IAW] (the Vice-President of Operations and Purchasing) in many forms of communication, including in e-mail messages and on his LinkedIn profile.

17. [Mr.] Fisher received a weekly salary from [IAW], and received paid vacation and sick leave. He also received a pre-tax health insurance payment benefit.

18. While he was working at DCW, from 2006 through 2009, [Mr.] Fisher's compensation was reported on 1099s, rather than on the payroll. From April 2010 to March 2012, [Mr.] Fisher received both an annual salary and a commission. [IAW] made tax deductions and provided a W-2 tax return for the salary, and made no deductions and provided a 1099 tax form for the commissions.

19.     [Mr.] Fisher had a custom-built office at [IAW], with a computer, telephone, company e-mail address, and office supplies provided for his use by [IAW].

20.     [Mr.] Fisher maintained a regular schedule of hours worked at [IAW's] office, and reported any absences and variations from his schedule to [IAW's] personnel manager.

21.     As a supervisor at [IAW], [Mr.] Fisher's tasks included hiring employees, evaluating their performance, and managing their schedules.

22.     [Mr.] Fisher was included in [IAW's] Pennsylvania Unemployment Compensation Reports as an employee of [IAW].

**[IAW's] Relationship with Able Planet[, Incorporated ("Able Planet")]**

23.     In 2010, a salesman for Able Planet contacted [IAW] to suggest that [IAW] help it sell Apple products. Able [Planet] needed to sell a greater volume of products in order to keep its Apple distributor contract.

24.     By April 2011, Able [Planet] decided to use [IAW] for all Apple premium incentive programs going forward. Able [Planet] has used [IAW] as its distributor internationally as well as nationally.

25.     Previously, [IAW] had purchased items from Able [Planet] for resale.  The course of dealing was that [IAW] would sell products manufactured by Apple to third parties, who would then sell them to the public.  [IAW] would wire the funds to Able [Planet], who would order the products from Apple.  Apple would then ship the products to the customers directly.

**Diverted Sales**

26.     In 2011, [Mr.] Lacheen, the [P]resident of [IAW], told [Mr.] Fisher to change [the company's] procedure and have [IAW] customers pay up front for Apple products.

27.     After it became clear to [Mr.] Fisher that [IAW's] customers were willing to pay for Apple products up front, he began diverting sales from [IAW], and having the customers work directly with Able [Planet].

28.     [Mr.] Fisher diverted sales from [IAW] to Able [Planet], with commission payments sent from [Able Planet] to [Mr.] Fisher's bank account.

29.     Shortly thereafter, as [Mr.] Lacheen understood it, [IAW's] sales of Apple products "fell off the cliff."

30.     [Mr.] Fisher arranged matters to conceal his diverted business from [IAW], including arranging for an Able Planet e-mail address to be set up for his diverted sales communications.

31.     On May 25, 2012, [Mr.] Fisher told [Mr.] Lacheen that he had not been able to sell any Apple products because major retailers were selling them for below the price that [IAW] could get from Able [Planet]. Previously that same day, [Mr.] Fisher e-mailed Kevin Semcken, the [P]resident of Able [Planet], and told him that he had to "send Stuart [Lacheen] an e-mail saying you [Semcken] are not giving me a good discount [and] that [is] why I can't sell Apple."

32.     In fact, however, [Mr.] Fisher was placing orders. Four days before these e-mails, [Mr.] Fisher e-mailed [Mr.] Semcken, stating "I have a ton of orders." [Mr.] Fisher sold approximately $12 million worth of Apple products in April and May 2012.

33.     Similarly, in January 2012, [Mr.] Fisher e-mailed a new contact that he was currently selling $5 million per month of Apple products. At this time, no sales of Apple products were going through [IAW].

34.     Periodically, [Mr.] Fisher would permit small orders to be placed through [IAW]. In July 2011, Kevin Semcken told [Mr.] Fisher not to place any more orders through [IAW] without first discussing it with him.

35.     [Mr.] Fisher admitted in an April 25, 2012 message to Gary Marcus, [P]resident of one of [IAW's] customers[,] Computer Mechanics On Call, that "[I've] been backing up my computer on my portable hard drive so when I go I have everything including 30k e-mail address[es]."  [Mr.] Fisher also told [Mr.] Marcus that he was deleting items from [IAW's] computer server in order to conceal his diverted sales.

36.     On December 14, 2011, [Mr.] Fisher sent [Mr.] Marcus an instant message stating that "also I am not doing this through my company so we really need to keep it quiet."  Similarly, on May 17, 2012, [Mr.] Fisher messaged Marcus, [stating "Stuart Lacheen's] over here[,] waiting for him to leave…too many eyes on me right now."

37.     [Mr.] Fisher admits that prior to being employed by [IAW], he had no relationship with [IAW's] customer companies, Computer Mechanics On Call, Worldwide Mobile Trading, Electronic Explosion, or Digital Trading.  [Mr.] Fisher diverted approximately $30 million in sales to these companies.

(Findings of Fact/Conclusions of Law, filed January 23, 2015, at 1-7) (internal citations omitted).  On May 28, 2012, IAW fired Mr. Fisher after discovering Mr. Fisher's actions.

Procedurally, on June 28, 2012, IAW filed a complaint against Able Planet, API Direct (an alter ego and/or affiliate of Able Planet), Kevin Semcken (President of Able Planet), Certified Electronics (another alter ego and/or affiliate of Able Planet) (collectively, "Able Planet Defendants"), and Mr. Fisher.  As to Mr. Fisher, IAW alleged breach of contract, tortious interference with contractual relations, civil conspiracy, and theft/conversion. On September 6, 2012, Mr. Fisher filed an answer and new matter.  IAW filed a reply to Mr. Fisher's answer and new matter on September 18, 2012.

On April 4, 2013, IAW filed a motion to compel against Mr. Fisher seeking production of documents and electronically stored information ("ESI") and answers to interrogatories. IAW alleged that it had served Mr. Fisher with discovery requests on January 11, 2013, but Mr. Fisher had failed to respond. On April 15, 2013, the court entered an order directing Mr. Fisher to provide **full and complete** answers and responses to IAW's interrogatories; and to produce **all** documents and ESI in response to IAW's request for production of documents, within ten (10) days, **or risk sanctions** upon application to the court.[1]

On May 31, 2013, IAW filed a motion for sanctions against Mr. Fisher for failure to comply with the court's April 15, 2013 order. IAW alleged, *inter alia*, Mr. Fisher had provided in response to the court's order, deficient and incomplete answers to IAW's interrogatories and deficient and incomplete responses to IAW's request for production of documents. IAW also complained that on May 9, 2013, Mr. Fisher had produced a disk which contained only 90 pages of scanned documents, most of which were copies of IAW's discovery responses or were non-responsive. On June 24, 2013,

_____

[1] The April 15, 2013 order stated: "AND NOW, this 15th day of April, 2013, upon consideration of [IAW's] Motion to Compel Production of Documents and ESI and Compel Answers to Interrogatories and any response thereto, IT IS HEREBY ORDERED AND DECREED THAT Defendant, [Mr.] Fisher shall have ten (10) days to: (1) provide full and complete answers and responses to [IAW's] Interrogatories; (2) produce all documents and ESI in response to [IAW's] Requests for Production or risk sanctions upon application to the [c]ourt." (Order, dated April 15, 2013, at 1; R.R. at 174a).

upon consideration of IAW's motion for sanctions, the court appointed a discovery master.

On June 27, 2013, the court entered an order, upon recommendation of the discovery master, directing Mr. Fisher to provide by July 18, 2013, itemization of all transactions involving himself with any and all customers or entities, listed in IAW's interrogatories, from 2010-2013. The court also directed Mr. Fisher to provide all e-mails and ESI between himself and any employees of Able Planet. The court stated that IAW's motion for sanctions would remain outstanding pending Mr. Fisher's compliance.[2]

On July 9, 2013, the court clarified its order to define "transactions" (as used in the June 27, 2013 order) as purchase orders, e-mails and other ESI from January 1, 2010 through May 31, 2013. The court expressly reaffirmed the terms of the June 27, 2013 order.

IAW filed a renewed motion for sanctions on August 16, 2013, claiming Mr. Fisher had failed to comply with the court's June 27, 2013 and July 9, 2013 orders. IAW alleged Mr. Fisher's conduct warranted a court order precluding Mr. Fisher from introducing any evidence at trial. The court denied IAW's motion on August 26, 2013, stating no further discovery

_____

[2] The June 27, 2013 order directed Mr. Fisher to "provide [IAW] for the Calendar years 2010, 2011, 2012, 2013 in legible clear, Point 12 Font itemization of all transactions involving [Mr.] Fisher with any and all customers or entities listed in [IAW's] Interrogatories" and to "provide all e-mails and other ESI between himself and employees of Able [Planet]." (Order, dated June 27, 2013, at 1, ¶¶ 1, 3; R.R. at 182a).

motions would be entertained without express permission from the discovery master.

On September 27, 2013, the court entered an order, upon recommendation of the discovery master, directing Mr. Fisher to deliver for forensic examination his home tower computer, laptop(s), external hard drive(s), iPhone, flash media, thumb drive(s), and any and all other electronic devices in which ESI may be stored.[3]

With express permission from the discovery master, IAW filed a motion for sanctions against Mr. Fisher on April 2, 2014, based on Mr. Fisher's failure to comply with the court's discovery orders and spoliation of evidence. IAW claimed, *inter alia*, Mr. Fisher provided insufficient and incomplete discovery responses in direct violation of the court's orders dated April 15, 2013, June 27, 2013, and September 27, 2013, which had directed

---

[3] The September 27, 2013 order stated: "AND NOW, this 27th day of September 2013, upon the recommendation of the Discovery Master…and in order to expedite the completion of discovery by the parties, it is hereby ORDERED that Defendant [Mr.] Fisher (hereinafter, "Fisher") will deliver for forensic examination his home tower computer, laptop(s), external hard drive(s), iPhone, flash media and thumb drive(s) and any and all other electronic devices (hereinafter "storage media") in which ESI may be stored to the following digital forensic examination facility which will employ the following protocols: (1) Fisher will deliver all the aforementioned storage media devices to Impact Information Solutions (hereinafter "Impact") within two (2) days of the docketing of this Order at which time a Chain of Custody form of which is attached hereto as exhibit A for each piece of media will be completed. At every custody exchange of the media the Chain of [C]ustody form will record the date, time and signatures of the parties involved in the transfer of said media. …" (Order, dated September 27, 2013, at 1; R.R. at 208a).

Mr. Fisher to provide full and complete answers and responses to IAW's discovery requests, and to deliver all electronic devices and ESI for forensic examination. IAW also maintained that its forensic examination of Mr. Fisher's electronic devices showed Mr. Fisher deleted files from his computer and used a file-wiping program as well. Based on Mr. Fisher's discovery violations, IAW asked the court to enter a preclusion order barring Mr. Fisher from presenting any evidence at trial, and to draw an adverse inference against Mr. Fisher for spoliation of evidence.

The court held a hearing on IAW's motion on August 11, 2014. The court heard testimony from Joseph Scheuer, the Digital Operations Director of EPIC Information Solutions (also known as, Impact Information Solutions). Mr. Scheuer testified, *inter alia*, that a forensic examination of Mr. Fisher's computer confirmed Mr. Fisher had installed a file-wiping program on his computer and had deleted hundreds of thousands of files. Mr. Scheuer explained he could only retrieve some files in fragment form. Mr. Scheuer also testified that Mr. Fisher failed to provide for examination of certain electronic devices, in violation of the court's discovery orders. On Mr. Fisher's behalf, the court heard testimony from Tom Ricca, a consultant at IT Specialists. Mr. Ricca testified, *inter alia*, that his review of Mr. Fisher's computer suggested Mr. Fisher had installed free anti-virus software that might have automatically performed a file wiping. Mr. Ricca also suggested that the files which had been deleted on Mr. Fisher's computer were merely

temporary files which appear every time the user downloads a file, and which are automatically deleted if that file is not saved. Mr. Ricca testified that it did not appear that Mr. Fisher had tampered with his computer. Mr. Fisher also testified that he did not destroy any evidence and did not run a file-wiping program on his computer. Mr. Fisher said he failed to turn over for examination the laptop in his home because that is his daughter's device; and Mr. Fisher does not use it. Mr. Fisher insisted he complied with all discovery orders. At the conclusion of the hearing, the court granted IAW's motion for sanctions. Specifically, the court entered a preclusion order barring Mr. Fisher from offering any evidence at trial and permitted an adverse inference against Mr. Fisher for spoliation of evidence.

Prior to trial, the Able Planet Defendants settled with IAW; and the parties signed a stipulation to dismiss the Able Planet Defendants from the case with prejudice. On August 12-14, 2014, the court held a bench trial concerning IAW's claims against Mr. Fisher. By order dated January 23, 2015, with notice sent to the parties on January 26, 2015, the court entered a verdict in favor of IAW and against Mr. Fisher on the counts of breach of contract, tortious interference with contractual relations, and theft of trade secrets.[4] The court awarded IAW compensatory damages in the amount of $542,185.42, plus interest, totaling $668,122.15. The court also awarded

---

[4] IAW withdrew its claim for civil conspiracy before the conclusion of trial. The court did not find Mr. Fisher liable for conversion.

punitive damages in the amount of $50,000.00. Mr. Fisher timely filed post-trial motions on February 3, 2015. IAW subsequently filed post-trial motions seeking attorney's fees and costs. On April 17, 2015, the court denied Mr. Fisher's post-trial motions and granted IAW's request for attorney's fees and costs. The court scheduled a hearing on the attorney's fees for May 27, 2015. On May 27, 2015, following a hearing, the court awarded IAW attorney's fees and costs in the amount of $233,776.76. Mr. Fisher filed a premature notice of appeal on June 24, 2015. The court entered final judgment on the verdict on August 3, 2015.[5] The court did not order Mr. Fisher to file a concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(b), and Mr. Fisher filed none.

Mr. Fisher raises six issues for our review:

> DID THE TRIAL COURT ABUSE ITS DISCRETION BY ENTERING A DISCOVERY SANCTION ORDER PRECLUDING [MR.] FISHER FROM OFFERING ANY EVIDENCE AT TRIAL AND DRAWING AN ADVERSE INFERENCE AGAINST HIM

---

[5] Ordinarily, an appeal properly lies from the entry of judgment, not from the order denying post-trial motions. *See generally Johnston the Florist, Inc. v. TEDCO Const. Corp.*, 657 A.2d 511 (Pa.Super. 1995) (*en banc*). Nevertheless, a final judgment entered during pendency of an appeal is sufficient to perfect appellate jurisdiction. *Drum v. Shaull Equipment and Supply, Co.*, 787 A.2d 1050 (Pa.Super. 2001), *appeal denied*, 569 Pa. 693, 803 A.2d 735 (2002). Here, Mr. Fisher filed a premature notice of appeal on June 24, 2015, prior to the entry of judgment. Thus, Mr. Fisher's notice of appeal relates forward to August 3, 2015, the date judgment was entered. *See* Pa.R.A.P. 905(a)(5) (stating notice of appeal filed after court's determination but before entry of appealable order shall be treated as filed after such entry and on date of entry). Hence, no jurisdictional defects impede our review.

NOTWITHSTANDING THE FACT THAT NO PRIOR DISCOVERY SANCTIONS HAD BEEN ENTERED AGAINST [MR.] FISHER AND NO EVIDENCE WAS DETERMINED TO BE UNAVAILABLE TO [IAW] AT TRIAL?

DID THE TRIAL COURT ERR IN CONCLUDING AS A MATTER OF LAW THAT [IAW'S] STANDARD FORM CORPORATE POLICY ACKNOWLEDGEMENT CONSTITUTED A VALID, ENFORCEABLE CONTRACT?

DID THE TRIAL COURT ERR IN AWARDING DAMAGES AGAINST [MR.] FISHER FOR MISAPPROPRIATION OF TRADE SECRETS WHEN [IAW] FAILED TO ALLEGE SUCH A CLAIM IN ITS COMPLAINT AND THE EVIDENCE DID NOT ESTABLISH THE EXISTENCE OF ANY TRADE SECRET UNDER THE EXACTING STANDARD REQUIRED BY PENNSYLVANIA LAW?

DID THE TRIAL COURT [ERR] IN CONCLUDING THAT [MR.] FISHER WAS AN EMPLOYEE OF [IAW] NOTWITHSTANDING THE UNCONTRADICTED EVIDENCE THAT THE PARTIES AGREED THAT HE WOULD BE AN INDEPENDENT CONTRACTOR, AND THAT HE WAS TREATED AS AN INDEPENDENT CONTRACTOR THROUGHOUT THEIR RELATIONSHIP?

DID THE TRIAL COURT ERR IN REFUSING TO MOLD THE AWARD TO REDUCE THE DAMAGES ASSESSED AGAINST [MR.] FISHER BY THE AMOUNT OF CONSIDERATION RECEIVED BY [IAW] IN CONNECTION WITH ITS SETTLEMENT WITH CO-DEFENDANTS WHO WERE ALLEGED TO HAVE CAUSED THE SAME FINANCIAL HARM AS [MR.] FISHER?

DID THE TRIAL COURT ERR IN AWARDING [IAW] ATTORNEY'S FEES AND COSTS ON THE BASIS OF A PROVISION IN THE CORPORATE POLICY ACKNOWLEDGMENT ([IAW'S] EXHIBIT 2) WHEN THAT DOCUMENT DOES NOT CONSTITUTE A VALID AND BINDING CONTRACT?

(Mr. Fisher's Brief at 4-5).

In his first issue, Mr. Fisher argues the trial court issued an excessive

and unduly harsh preclusion order when a less drastic discovery sanction could have adequately addressed Mr. Fisher's conduct. Mr. Fisher asserts the court failed to consider all of the following factors when fashioning its discovery sanction: (1) the nature and severity of the discovery violation; (2) Mr. Fisher's willfulness or bad faith; (3) prejudice to IAW; (4) the ability to cure the prejudice; and (5) the importance of the precluded evidence in light of the failure to comply. Mr. Fisher concedes that the first two factors weigh in favor of imposition of a discovery sanction against Mr. Fisher. Nevertheless, Mr. Fisher emphasizes that the court had not found Mr. Fisher in violation of any discovery order prior to imposition of the preclusion order and had not previously imposed any sanctions against Mr. Fisher. Mr. Fisher insists IAW did not suffer prejudice because the files allegedly deleted from Mr. Fisher's electronic devices were still available to IAW in fragment form; and Mr. Scheuer was able to retrieve some documents after reviewing the documents in fragmented form. Mr. Fisher claims IAW also had access to sufficient relevant documents, produced from the Able Planet Defendants and other non-parties, to support IAW's claims. Mr. Fisher suggests the only prejudice IAW suffered as a result of Mr. Fisher's actions was an additional significant expense to prepare for trial; so, the preclusion order exceeded the economic ability to cure the prejudice. Mr. Fisher contends IAW cannot point to the loss of any specific evidence as a result of Mr. Fisher's conduct. Mr. Fisher complains the preclusion order unfairly deprived Mr. Fisher of an

opportunity to defend his case and limited the court to only "one side of the story." Mr. Fisher concludes the court's preclusion order was tantamount to the entry of a default judgment against him in this case, and this Court should reverse the preclusion order and remand for a new trial.[6] We disagree.

"Generally, imposition of sanctions for a party's failure to comply with discovery is subject to the discretion of the trial court as is the severity of the sanctions imposed." *Cove Centre, Inc. v. Westhafer Const., Inc.*, 965 A.2d 259, 261 (Pa.Super. 2009). The trial court is responsible for overseeing the discovery process and has the discretion to determine the appropriate measures necessary to insure adequate and prompt discovery. *Berkeyheiser v. A-Plus Investigations, Inc.*, 936 A.2d 1117 (Pa.Super. 2007). *See also George v. Schirra*, 814 A.2d 202 (Pa.Super. 2002)

---

[6] Mr. Fisher does not contest that he violated the discovery orders (*see* Mr. Fisher's Brief at 19); he attacks only the severity of the preclusion order imposed. Additionally, notwithstanding the phrasing of Mr. Fisher's first question presented, he presents no legal argument regarding the court's decision to draw an adverse inference against him. To the extent that Mr. Fisher attempts to challenge the adverse inference, that claim is waived. *See Lackner v. Glosser*, 892 A.2d 21 (Pa.Super. 2006) (explaining arguments must adhere to rules of appellate procedure and arguments which are not appropriately developed are waived on appeal; arguments not appropriately developed include those where party has failed to cite any authority in support of contention); *Estate of Haiko v. McGinley*, 799 A.2d 155 (Pa.Super. 2002) (stating appellant must support each question raised by discussion and analysis of pertinent authority; absent reasoned discussion of law in appellate brief, this Court's ability to provide review is hampered, necessitating waiver on appeal).

(explaining discovery rulings are uniquely within discretion of trial court and will not be reversed unless they constitute abuse of discretion). Additionally:

> When reviewing a court's decision to grant or deny a spoliation sanction, we must determine whether the court abused its discretion. Such sanctions arise out of the common sense observation that a party who has notice that evidence is relevant to litigation and who proceeds to destroy evidence is more likely to have been threatened by that evidence than is a party in the same position who does not destroy the evidence. Our courts have recognized accordingly that one potential remedy for the loss or destruction of evidence by the party controlling it is to allow the jury to apply its common sense and draw an "adverse inference" against that party. Although award of summary judgment against the offending party remains an option in some cases, its severity makes it an inappropriate remedy for all but the most egregious conduct.

***Creazzo v. Medtronic, Inc.***, 903 A.2d 24, 28-29 (Pa.Super. 2006) (internal citations and some quotation marks omitted).

Pennsylvania Rule of Civil Procedure 4019 governs the imposition of discovery sanctions as follows:

**Rule 4019.  Sanctions**

(a)(1)   The court may, on motion, make an appropriate order if[:]

(i)    a party fails to serve answers, sufficient answers or objections to written interrogatories under Rule 4005;

\* \* \*

(viii) a party or person otherwise fails to make discovery or to obey an order of court respecting

discovery.

* * *

(c)     The court, when acting under subdivision (a) of this rule, may make[:]

* * *

(2)     an order refusing to allow the disobedient party to support or oppose designated claims or defenses, or prohibiting such party from introducing in evidence designated documents, things or testimony, or from introducing evidence of physical or mental condition;

(3)     an order striking out pleadings or parts thereof, or staying further proceedings until the order is obeyed, or entering a judgment of *non pros* or by default against the disobedient party or party advising the disobedience[.]

* * *

(5)     such order with regard to the failure to make discovery as is just.

* * *

Pa.R.C.P. 4019(a)(1)(i), (viii), (c)(2), (c)(3), (c)(5).

"When a discovery sanction is imposed, the sanction must be appropriate when compared to the violation of the discovery rules." ***Anthony Biddle Contractors, Inc. v. Preet Allied American Street, LP***, 28 A.3d 916, 926 (Pa.Super. 2011) (internal quotation marks omitted).  The trial court should consider:

(1)   the nature and severity of the discovery violation;

(2)   the defaulting party's willfulness or bad faith;

(3)   prejudice to the opposing party;

(4)    the ability to cure the prejudice; and

(5)    the importance of the precluded evidence in light of the failure to comply.

*Id.* (internal citations and quotation marks omitted). "[E]ach factor represents a necessary consideration, not a necessary prerequisite." ***Croydon Plastics Co., Inc. v. Lower Bucks Cooling & Heating***, 698 A.2d 625, 629 (Pa.Super. 1997), *appeal denied*, 552 Pa. 689, 717 A.2d 1028 (1998).

This Court has upheld severe discovery sanctions for egregious discovery violations. ***See id.*** (affirming discovery sanction precluding plaintiff/appellant from introducing expert testimony, which resulted in entry of summary judgment in favor of defendant, where plaintiff/appellant violated multiple discovery orders and failed to file expert report for fourteen months after court unequivocally directed plaintiff/appellant to file report within sixty days); ***Miller Oral Surgery, Inc. v. Dinello***, 611 A.2d 232 (Pa.Super. 1992), *appeal denied*, 533 Pa. 651, 624 A.2d 111 (1993) (affirming court's entry of default judgment against defendants on issue of liability where defendants refused to answer interrogatories in violation of court order; explaining any other sanction would be totally ineffectual, due to type of information which was in defendants' exclusive control and which trial court decided plaintiff was entitled to).

Additionally, "[s]poliation of evidence is the non-preservation or

significant alteration of evidence for pending or future litigation." ***PTSI, Inc. v. Haley***, 71 A.3d 304, 315 (Pa.Super. 2013) (internal citations and quotation marks omitted). In determining the appropriate sanction for spoliation of evidence, the court must weigh:

> (1) the degree of fault of the party who altered or destroyed the evidence; (2) the degree of prejudice suffered by the opposing party; and (3) whether there is a lesser sanction that will avoid substantial unfairness to the opposing party and, where the offending party is seriously at fault, will serve to deter such conduct by others in the future.

***Creazzo, supra*** at 29.

Instantly, the history of this case makes clear that Mr. Fisher's non-compliance with IAW's discovery requests forced IAW to file multiple motions to compel and motions for sanctions. IAW initially filed a motion to compel on April 4, 2013, after Mr. Fisher had failed to respond to IAW's January 11, 2013 discovery requests. The court entered an order on April 15, 2013, directing Mr. Fisher to provide full and complete answers and responses to IAW's interrogatories and to produce all documents and ESI in response to IAW's request for production of documents, within ten days. Based on Mr. Fisher's failure to comply, IAW filed a motion for sanctions on May 31, 2013, alleging Mr. Fisher had provided deficient and incomplete answers to IAW's discovery requests. The court subsequently appointed a discovery master. Upon recommendation of the discovery master, the court entered another order on June 27, 2013, directing Mr. Fisher to itemize all of his transactions

with any and all customers or entities listed in IAW's interrogatories, from 2010-2013, and to provide all of his e-mails and ESI with any employees of Able Planet. The court clarified and reaffirmed this order on July 9, 2013. Mr. Fisher again failed to comply with the court's discovery order, so IAW filed a renewed motion for sanctions on August 16, 2013, seeking preclusion of Mr. Fisher's evidence at trial. On September 27, 2013, the court entered another discovery order, directing Mr. Fisher to deliver for forensic examination various electronic devices in which ESI may be stored. Mr. Fisher remained non-compliant with the court's directive. Upon learning Mr. Fisher had deleted substantial evidence, IAW moved for sanctions, on April 2, 2014, again asking the court to preclude Mr. Fisher from presenting any evidence at trial and to draw an adverse inference against Mr. Fisher for spoliation of evidence. Based on IAW's multiple motions for sanctions and the express language of Rule 4019(c)(2), Mr. Fisher was unquestionably on notice that he faced sanctions in the nature of a preclusion order due to his continued dilatory and defiant conduct. *See* Pa.R.C.P. 4019(c)(2).

The court held a hearing on IAW's most recent motion for sanctions on August 11, 2014. At the hearing, IAW presented testimony from Mr. Scheuer, the Digital Operations Director of EPIC Information Solutions (also known as, Impact Information Solutions). Mr. Scheuer testified, *inter alia*, that a forensic examination of Mr. Fisher's computer confirmed Mr. Fisher had installed a file-wiping program on his computer and had deleted

hundreds of thousands of files. Mr. Scheuer explained he could only retrieve some files in fragment form. Mr. Scheuer also testified that Mr. Fisher failed to provide for examination certain electronic devices, in violation of the court's discovery orders.

On Mr. Fisher's behalf, the court heard testimony from Mr. Ricca, a consultant at IT Specialists. Mr. Ricca testified, *inter alia*, that his review of Mr. Fisher's computer suggested Mr. Fisher had installed free anti-virus software that might have automatically performed a file wiping. Mr. Ricca also suggested that the files which had been deleted on Mr. Fisher's computer were merely temporary files which appear every time the user downloads a file, and which are automatically deleted if that file is not saved. Mr. Ricca testified that it did not appear that Mr. Fisher had tampered with his computer. Mr. Fisher also testified that he did not destroy any evidence and did not run a file-wiping program on his computer. Mr. Fisher said he failed to turn over for examination the laptop in his home because it is his daughter's device; and Mr. Fisher does not use it. Mr. Fisher insisted he complied with all discovery orders.

At the conclusion of the hearing, the court stated:

> Okay. Let me give you my ruling. I realize this is in a summary form, and I will try not to leave things out, but obviously, we have had court for several hours and multiple witnesses. This is not uncomplicated. So, let me just give you the long and short here.
>
> This is a case where there [have] been contentious discovery disputes that resulted in the appointment of a

Discovery Master. There have been multiple instances of the parties either contacting me or contacting the Discovery Master. And I think it is obviously no surprise I have been in contact with the Discovery Master only because I am interested in the case, and I have to deal with him from time to time with respect to issues.

So, you get a sense of discovery disputes. I do not deal with a huge number of them because I try to discourage them, but occasionally, they do come up to court, they occasionally require…the appointment of a Master. So, this is basically my ruling based on the evidence that I have heard, reviewing the documents and evaluations of credibility in this matter.

I find Mr. Scheuer who testified…to be a credible witness. I fin[d] aspects of Mr. Ricca's testimony and Mr. Fisher's testimony to be less than credible. I find that with respect to—and I am going to rely mainly on Mr. Scheuer's affidavit which is Exhibit 8, Page Two, the petition that a number of things strike me as being fairly blatant and problematic in this extended discovery dispute which [has] now blossomed into a case ready for trial. Particularly in Paragraph Six, it is clear that a number of plug-in devices were never turned over, and Mr. Scheuer describes how he was able to determine a log of devices that were attached to the Dell tower.

[Mr. Scheuer] provided a list of 11 devices that were attached that—not attached, but that a number of these devices were not turned over, and there is a schedule in Paragraph Six. In addition[,] not turned over was the laptop, which I understand [Mr. Fisher] said belongs to his daughter or daughters. But we cannot have individual litigants making discovery decisions. An order was made. It was crystal clear. There was no question that it was required to be turned over. If it was examined and found to have no documentation, no relevant documentation, it would have been returned, and I have no doubt of that. But it was not turned over. The iPhone was eventually turned over, but that was pretty much at the schedule set by Mr. Fisher and not by the [c]ourt Order.

I am also very concerned about the issues raised in

Paragraph Eight of Mr. Scheuer's affidavit. You had a complaint. Well, actually, [Mr. Fisher's] employment terminated May 28th of 2012, a complaint was filed June 28th 2012, the complaint was served sometime in July of 2012, the file deletions up until and through early July of 2012 were quite small in number. In August of 2012, close to 300,000 files were deleted. There was smaller activity for the balance of 2012 up through—there was a small spike in February of 2013. But April 15th of 2013, there was an order to comply with interrogatories and production of documents. The month of April saw the deletion in excess of 1,400 files, in the month of May saw the deletion of slightly south of 150,000 files.

There was an order on June 27, 2013, transactions and documentation interrogatory be complied, and there was no compliance. There was another order of September 27th of 2013 for electronic devices. Once again, in the month of September, slightly more than 14,000 files were deleted. There was a turnover requirement because there had still not been compliance.

[I]n the month of October, there were 5,700 files deleted. The turnover was to be of some devices that there still was not[:] the iPhone, the laptop, multiple thumb drives or hard drives.

Maybe it is a coincidence, maybe it is not, but I think that certainly an inference can be drawn that something was going on with respect to these files being deleted when you place the number and the timing, I do not feel that that is coincidental.

I am also very troubled by this issue of documents that were admitted as P-4. I understand [Mr. Fisher's counsel] is taking the position that they were turned over, but I do not think it is quite that simple. The expert found them based upon their appearance in fragment form. It came from the PC provided by [Mr. Fisher]. Obviously, a fragment form, I take that to mean they were not in full form.

But I do not think that it is the role of the plaintiff in a discovery dispute, it is not a role of any party to be playing

- 23 -

"gotcha," that maybe we can find the documents, maybe we can, maybe we cannot, but that is not what discovery is. Discovery is the performance to turn over documents. I understand you have disputes. That is what I do once a week, and I understand that nobody is perfect. I am way past that point, but this handling of these documents and these files and these electronic devices by Mr. Fisher is far more extreme than anything I have ever seen, and I have seen a lot, but this is more than that.

So, I cannot permit this to take place in the court. If the plaintiffs were doing this, I would not permit it either. I do not permit anybody to do this. It [undermines] the whole informal discovery process, it lengthens the litigation, it turns it into nothing more than just a game, which some people think it is; I do not. And I understand you are in business, but I do not think that this is something that— that this conduct should be encouraged and certainly not [condoned].

So, the long and short of it is, number one, based upon what I consider extremely serious discovery violations, I am going to enter an order that would preclude [Mr. Fisher] from putting on any evidence in the defense, number one.

And number two, that I will draw the adverse inference…because I very firmly believe hearing all of the witnesses in this case, that something was done here to these records, and it is an extreme, a very extreme, the most extreme sanction, one that I have thought very long and hard about, it is one that I really do not appreciate having to impose, but it is one that very fortunately I think is justified, and I think the record is quite clear. So, that is the order.

(N.T. Discovery Hearing, 8/11/14, at 110-16; R.R. at 362a-368a).

The court's analysis makes clear it considered Mr. Fisher's failure to comply with its April 15, 2013, June 27, 2013, and September 27, 2013 discovery orders. Not only did Mr. Fisher repeatedly ignore or fail to respond

adequately to IAW's written interrogatories and request for production of documents, but the court also found Mr. Fisher had wiped his computer and deleted hundreds of thousands of files since the beginning of this litigation. Notwithstanding this egregious conduct, which the trial court referred to as "far more extreme than anything [the court had] ever seen," the court did not impose the most extreme sanction of a default judgment against Mr. Fisher. Unlike the entry of a default judgment, which would have resulted in a verdict in favor of IAW on the issue of liability on all counts and a trial solely on damages, IAW still had to prove each of its claims against Mr. Fisher at trial. Additionally, Mr. Fisher had an opportunity to lodge objections throughout trial, to perform extensive and thorough cross-examination of each of IAW's witnesses, and to make closing arguments. The court did not announce its verdict in favor of IAW until it heard all evidence presented from IAW and considered the proposed findings of fact and conclusions of law submitted by the parties; and the court expressly found Mr. Fisher not liable for conversion. Thus, Mr. Fisher's contention that the court's preclusion order was tantamount to entry of a default judgment is simply inaccurate.

As well, the court did not have to issue lesser sanctions before imposing the preclusion order at issue. *See, e.g., Croydon Plastics, supra*; *Miller Oral Surgery, supra*. The record confirms the court considered all relevant factors before entering the preclusion order; and

imposed sanctions consistent with the Rules of Civil Procedure. *See Anthony Biddle Contractors, supra*; *Creazzo, supra*. *See also* Pa.R.C.P. 4019(c)(2). Therefore, we see no reason to disturb the discovery decision in this case. *See Cove Centre, supra*; *Berkeyheiser, supra*; *Creazzo, supra*; *George, supra*.

With respect to Mr. Fisher's remaining claims, after a thorough review of the record, the briefs of the parties, the applicable law, and the well-reasoned opinions of the Honorable Gary S. Glazer, we conclude Mr. Fisher's issues two through six merit no relief. The trial court opinions comprehensively discuss and properly dispose of those questions.[7] (*See* Findings of Fact and Conclusions of Law at 9-10, 7-8; R.R. at 828a-829a, 826a-827a; Opinion Resolving Post-Trial Motions, filed April 17, 2015, at 2-4; R.R. at 857a-859a) (finding: **(issue 2)** Corporate Policy Acknowledgment Mr. Fisher signed in 2009 constituted valid contract; his employment with IAW began in October 2009, and Mr. Fisher signed contract on October 16, 2009, which was virtually contemporaneous to start of his employment with IAW; thus, Mr. Fisher's employment constituted valid consideration and restrictive covenant provision is enforceable;[8] **(issue 3)** Corporate Policy

---

[7] In its opinions, the trial court sometimes refers to IAW as PMG.

[8] *See Missett v. Hub Inter. Pennsylvania, LLC*, 6 A.3d 530 (Pa.Super. 2010) (explaining restrictive covenants are enforceable in Pennsylvania if they are (1) ancillary to employment relationship; (2) reasonably necessary

*(Footnote Continued Next Page)*

Acknowledgment that Mr. Fisher signed shows IAW considered its customer and dealer lists confidential;[9] Mr. Fisher took customer information from IAW, which IAW developed; Mr. Fisher had access to information due to his employment; information was integral to IAW's business; Mr. Fisher's actions took place without IAW's knowledge or consent; in fact, Mr. Fisher

_(Footnote Continued)_ ───────────

for protection of employer; and (3) reasonable in duration and geographic scope); **Modern Laundry & Dry Cleaning Co. v. Farrer**, 536 A.2d 409, 411 (Pa.Super. 1987) (stating that for employment restriction to be considered "ancillary to employment," restriction must relate to contract of employment; there is no requirement that restriction appear in initial employment agreement; so long as employment restriction is "an auxiliary part of the taking of employment and not a later attempt to impose additional restrictions on an unsuspecting employee, such a covenant is supported by valid consideration and is therefore enforceable"). Pennsylvania courts have consistently held the acceptance of employment is sufficient consideration for a restrictive covenant. **See id.**; **Records Center, Inc. v. Comprehensive Management, Inc.**, 525 A.2d 433 (Pa.Super. 1987). Mr. Fisher does not challenge the duration or geographic scope in the 2009 Corporate Policy Acknowledgment. We also reject Mr. Fisher's contention that IAW sought only to eliminate competition and to keep Mr. Fisher from soliciting IAW's customers; rather, the restrictive covenant also expressly sought to protect IAW's customer and dealer lists as confidential and proprietary. **See Hess v. Gebhard & Co. Inc.**, 570 Pa. 148, 808 A.2d 912 (2002) (explaining that fundamental to any enforcement is assessment of legitimate interest of employer to be protected as condition precedent to validity of covenant not to compete; generally, interests which can be protected through covenants include trade secrets, confidential information, good will, and unique/extraordinary skills).

[9] **See A.M. Skier Agency, Inc. v. Gold**, 747 A.2d 936 (Pa.Super. 2000) (explaining how in many businesses, permanent and exclusive relationships are established between customers and salesmen; customer lists and customer information compiled by such businesses represent material investment of employers' time and money; this information is highly confidential and constitutes valuable business asset; such data has been held to be property in nature of "trade secret" for which employer is entitled to protection, independent of non-disclosure contract).

made great strides to conceal his actions from IAW; Mr. Fisher left IAW with IAW's customer lists and contact information and used them to his own and Able Planet's benefit, which seriously damaged IAW's business; thus, Mr. Fisher is liable for theft of trade secrets;[10] **(issue 4)** during time Mr. Fisher worked for IAW, he participated in regular business of company and used equipment and office space IAW provided; IAW controlled Mr. Fisher's time and manner of work; Mr. Fisher held himself out as employee of IAW in his interactions with customers; thus, totality of circumstances shows Mr. Fisher was employee of IAW and not independent contractor; **(issue 5)** Able Planet Defendants, who settled with IAW prior to trial, were not "joint tortfeasors" with Mr. Fisher; IAW's claims against Able Planet Defendants did not mirror those asserted against Mr. Fisher; court required Mr. Fisher to pay IAW commissions he received from wrongfully diverted sales, which was benefit

_____

[10] We reject Mr. Fisher's assertion that IAW did not assert a claim for theft of trade secrets in its complaint. IAW's theft count as pled in the complaint alleged, *inter alia*, Mr. Fisher absconded with confidential materials including customer lists, confidential and proprietary vendor sources, prospects, price lists and pricing strategies including 30,000 e-mail addresses of IAW's customers. (**See** Complaint, filed June 28, 2012, at 6, 9; R.R. at 60a; 63a.) The confidential materials named in the complaint are entitled to "trade secret" protection. **See A.M. Skier Agency, supra**. Additionally, in count six of IAW's complaint against Mr. Fisher (tortious interference with contractual relations), IAW specifically alleged: "In addition, as a result of [Mr.] Fisher's interference, many large volume customers—many of which came to [IAW] through the efforts of [Mr.] Fisher's co-employees—have declined to do business with [IAW] as a result of the conduct of [Mr.] Fisher in communicating [IAW] trade secrets to others." (**See** Complaint at 15, ¶ 82; R.R. at 69a.) Moreover, Mr. Fisher expressly denied in filings early on in this litigation that he had communicated any alleged "trade secrets."

only Mr. Fisher received, and any judgment Able Planet Defendants owed to IAW should not serve as set-off; there was insufficient evidence in record to calculate IAW's lost profits with reasonable certainty, so court awarded IAW readily ascertainable amount of commissions earned as result of Mr. Fisher's actions; **(issue 6)** Corporate Policy Acknowledgment Mr. Fisher signed in 2009 was valid and enforceable contract, which Mr. Fisher breached; contract expressly provides that employee will pay attorney's fees and costs for violation of restrictive covenant).  Accordingly, we affirm.

Judgment affirmed.

Judge Mundy did not participate in the consideration or decision of this case.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: <u>9/23/2016</u>

THE COURT OF COMMON PLEAS OF PHILADELPHIA COUNTY
FIRST JUDICIAL DISTRICT OF PENNSYLVANIA
CIVIL TRIAL DIVISION

| | | |
|---|---|---|
| IT'S ALL WIRELESS, INC.<br>Trading as PRO MOBILE GEAR,<br>                      Plaintiff, | : | JUNE TERM, 2012 |
| v. | : | No. 3874 |
| ABLE PLANET, INCORPORATED,<br>API DIRECT, LLC,<br>CERTIFIED ELECTRONICS, LLC,<br>KEVIN SEMCKEN,<br>     and<br>DAVID FISHER,<br>                  Defendants. | : | Commerce Program |

**DOCKETED**
JAN 2 3 2015
C. HART
CIVIL ADMINISTRATION

## ORDER

**AND NOW**, this 23rd day of January, 2015, after a non-jury trial of this matter, and in accord with the Findings of Fact and Conclusions of Law issued simultaneously, it is **ORDERED** as follows:

1. A finding is entered in favor of Plaintiff, It's All Wireless, Inc., against Defendant David Fisher, in the amount of $542,185.42, plus prejudgment interest of six percent per annum from March 11, 2011 of $125,936.73, totaling $668,122.15.

2. Punitive damages are awarded to plaintiff in the amount of $50,000.

**BY THE COURT:**

It'S All Wireless, Inc.-WSFFP

12060387400198

GLAZER, J.

THE COURT OF COMMON PLEAS OF PHILADELPHIA COUNTY
FIRST JUDICIAL DISTRICT OF PENNSYLVANIA
CIVIL TRIAL DIVISION

| | | |
|---|---|---|
| IT'S ALL WIRELESS, INC. | : | JUNE TERM, 2012 |
| Trading as PRO MOBILE GEAR, | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | No. 3874 |
| | : | |
| ABLE PLANET, INCORPORATED, | : | |
| API DIRECT, LLC, | : | |
| CERTIFIED ELECTRONICS, LLC, | : | |
| KEVIN SEMCKEN, | : | Commerce Program |
| and | : | |
| DAVID FISHER, | : | |
| Defendants. | : | |

FINDINGS OF FACT AND CONCLUSIONS OF LAW

**Findings of Fact**

**Parties**

1.      Plaintiff It's All Wireless, trading as Pro Mobile Gear ("PMG"), is a Pennsylvania

corporation with a place of business in Philadelphia, Pa.   PMG is a wholesaler of electronic

goods. (Complaint, paragraph 1, admitted in Fisher's Answer, paragraph 1.)

2.      Defendant David Fisher ("Fisher") is an individual residing at 86 Lilly Drive,

Feasterville, Pa. (Complaint, paragraph 7, admitted in Fisher's Answer, paragraph 7.)

**Background**

3.      In 2006, Fisher and Stuart Lacheen, ("Lacheen"), President of PMG, discussed the

possibility of starting an accessory business within Lacheen's existing business, Digital

1

Communications Warehouse (DCW). (Trial Transcript, pp.74-75, 8/12/14.)

4.    As a result of these discussions, Lacheen took the name Pro Mobile Gear from Fisher and his business partner, Howard Beloff, and hired Fisher and Beloff. (Trial Transcript pp.74- 75, 8/12/14.)

5.    Fisher was employed by DCW to sell Bluetooth headsets and accessories, as well as other wireless accessories and Apple products. (Trial Transcript pp.75, 82, 8/12/14.)

**Fisher's Employment with DCW and It's All Wireless.**

6.    Fisher began working for DCW in March 2006. (Trial Transcript p. 20, 8/12/14, Plaintiff's Exhibit 1.)

7.    In September 2009, DCW's business operations ceased. All of its employees, including Fisher, were transitioned to be employees of It's All Wireless ("PMG"). (Trial Transcript pp.22-23, 8/12/14.)

8.    When Fisher began working for DCW in March 2006, he signed a Corporate Policy Acknowledgement, which stated that he was entering into an "employment relationship" with DCW. (Trial Transcript p. 5, 8/12/14, Plaintiff's Exhibit 1.)

9.    Fisher also signed a second "Corporate Policy Acknowledgement" in March 2006, which stated that he understood that DCW's "customers and dealers and customer and dealer lists are proprietary" and that he agreed not to solicit the company's customers or dealers for a period of one year after the termination of his employment with DCW. (Trial Transcript p. 5, 8/12/14, Plaintiff's Exhibit 1, page 2.)

10.    In October 2009, It's All Wireless, Inc., formally began to exist. (Trial Transcript p. 23, 8/12/14.)

2

11.     On October 16, 2009, Fisher signed a substantially similar Corporate Policy Acknowledgement. (Trial Transcript pp. 25-26, 8/12/14, Plaintiff's Exhibit 2, Plaintiff's Exhibit 3.)

12.     The 2009 Acknowledgment again acknowledges that Fisher had an "employment relationship with It's All Wireless, Inc., or its affiliates." (Plaintiff's Exhibit 2.)

13.     The 2009 Acknowledgement also states that Fisher understood that "the Company's customers and dealer lists are confidential and proprietary" and that he agreed and covenanted not to solicit the Company's customers or dealers for a period of one year after the termination of his employment with PMG. (Plaintiff's Exhibit 2.)

14.     The 2009 Acknowledgment further stated that Fisher agreed with the statement, "the term 'employee' refers to all individuals who are required by law to receive W2s or 1099s." (Trial Transcript p. 24, 8/12/14, Plaintiff's Exhibit 2.)

15.     At the time Fisher signed the Acknowledgement in 2009, he also filled out an employee personal information form, signed an employee acknowledgement of PMG's sexual harassment policy, and signed a consent to drug and alcohol screening. (Trial Transcript p. 21, 8/12/14, Plaintiff's Exhibit 2.)

16.     Fisher held himself out to be an employee of PMG (the Vice-President of Operations and Purchasing) in many forms of communication, including in email messages and on his LinkedIn profile. (Trial Transcript pp. 36, 92, 93, 123, 124, 8/12/14, Plaintiff's Exhibits 8, 11, 12, 21, 22, 33.)

17.     Fisher received a weekly salary from PMG, and received paid vacation and sick leave. (Trial Transcript pp. 39, 40, 8/12/14, Plaintiff's Exhibit 9.) He also received a pre-tax health insurance payment benefit. (Trial Transcript pp. 87-88, 8/12/14.)

3

18.    While he was working at DCW, from 2006 through 2009, Fisher's compensation was reported on 1099s, rather than on the payroll. (Trial Transcript pp. 81-82, 8/13/14.) From April 2010 to March 2012, Fisher received both an annual salary and a commission. PMG made tax deductions and provided a W-2 tax form for the salary, and made no deductions and provided a 1099 tax form for the commissions. (Trial Transcript pp. 81-82, 83-84, 8/13/14, Plaintiff's Exhibit 9.)

19.    Fisher had a custom-built office at PMG, with a computer, telephone, company email address, and office supplies provided for his use by PMG. (Trial Transcript pp. 78-79, 85-87, 8/12/14.)

20.    Fisher maintained a regular schedule of hours worked at PMG's office, and reported any absences and variations from his schedule to PMG's personnel manager. (Trial Transcript pp. 30-33, 8/12/14, Plaintiff's Exhibit 6.)

21.    As a supervisor at PMG, Fisher's tasks included hiring employees, evaluating their performance, and managing their schedules. (Trial Transcript pp.33-34, 80, 84, 8/12/14, Plaintiff's Exhibit 7.)

22.    Fisher was included in PMG's Pennsylvania Unemployment Compensation Reports as an employee of It's All Wireless. (Trial Transcript p. 100, 8/12/14, Plaintiff's Exhibit 14.)

### PMG's Relationship with Able Planet

23.    In 2010, a salesman for Able Planet contacted PMG to suggest that PMG help it sell Apple products. Able needed to sell a greater volume of products in order to keep its Apple distributor contract. (Trial Transcript pp. 101-102, 8/12/14.)

4

24.     By April 2011, Able decided to use PMG for all Apple premium incentive programs going forward. (Trial Transcript pp. 102-104, 8/12/14, Plaintiff's Exhibit 15.)   Able has used PMG as its distributor internationally as well as nationally.  (Trial Transcript pp. 109-111, 8/12/14, Plaintiff's Exhibit 17.)

25.     Previously, PMG had purchased items from Able for resale. The course of dealing was that PMG would sell products manufactured by Apple to third parties, who would then sell them to the public.  PMG would wire the funds to Able, who would order the products from Apple. Apple would then ship the products to the customers directly.  (Trial Transcript pp. 93-96, 8/12/14.)


### Diverted Sales

26.     In 2011, Lacheen, the president of PMG, told Fisher to change their procedure and have PMG's customers pay up front for Apple products. (Trial Transcript pp. 93-95, 8/12/14.)

27.     After it became clear to Fisher that PMG's customers were willing to pay for Apple products up front, he began diverting sales from PMG, and having the customers work directly with Able.  (Trial Transcript pp. 113-115, 120-128, 133-139, 162-166, 168-189, 190-204, 8/12/14, Plaintiff's Exhibits  19, 21, 22, 26, 27, 28, 32,35, 37-42, 44, 48-50, 52.)

28.     Fisher diverted sales from PMG to Able, with commission payments sent from Able to Fisher's bank account.  (Trial Transcript pp. 115-124, 189-191, 8/12/14, Plaintiff's Exhibits 42-44.)

29.     Shortly thereafter, as Lacheen understood it, PMG's sales of Apple products "fell off the cliff."  (Trial Transcript p. 96, 8/12/14.)

30. Fisher arranged matters to conceal his diverted business from PMG, including arranging for an Able Planet email address to be set up for his diverted sales communications. (Trial Transcript pp. 116-118, 8/12/14, Plaintiff's Exhibit 20.)

31. On May 25, 2012, Fisher told Lacheen that he had not been able to sell any Apple products because major retailers were selling them for below the price that PMG could get from Able. Previously that same day, Fisher emailed Kevin Semcken, the president of Able, and told him that he had to "send Stuart [Lacheen] an email saying you [Semcken] are not giving me a good discount that [is] why I can't sell Apple." (Plaintiff's Exhibit 31.)

32. In fact, however, Fisher was placing orders. Four days before these emails, Fisher emailed Semcken, stating "I have a ton of orders." Fisher sold approximately $12 million worth of Apple products in April and May 2012. (Trial Transcript pp. 152-160, 8/12/14; Plaintiff's Exhibit 31.)

33. Similarly, in January 2012, Fisher emailed a new contact that he was currently selling $5 million per month of Apple products. At this time, no sales of Apple products were going through PMG. (Trial Transcript pp. 128-135, 8/12/14; Plaintiff's Exhibit 25.)

34. Periodically, Fisher would permit small orders to be placed through PMG. In July 2011, Kevin Semcken told Fisher not to place any more orders through PMG without first discussing it with him. (Trial Transcript pp. 151-152, 8/12/14; Plaintiff's Exhibit 30.)

35. Fisher admitted in an April 25, 2012 message to Gary Marcus, president of one of PMG's customers Computer Mechanics On Call, that "ive [sic] been backing up my computer on my portable hard drive so when I go I have everything including 30k email address." Fisher also told Marcus that he was deleting items from PMG's computer server in order to conceal his diverted sales. (Trial Transcript pp. 144-145, 8/12/14; Plaintiff's Exhibit 27.)

6

36. On December 14, 2011, Fisher sent Marcus an instant message stating that "also I am not doing this through my company so we really need to keep it quiet." Similarly, on May 17, 2012, Fisher messaged Marcus "stuarts [sic] over here waiting for him to leave...too many eyes on me right now." (Trial Transcript pp. 142-145, 8/12/14; Plaintiff's Exhibit 27.)

37. Fisher admits that prior to being employed by PMG, he had no relationship with PMG's customers companies, Computer Mechanics on Call, Worldwide Mobile Trading, Electronic Explosion, or Digital Trading. Fisher diverted approximately $30 million in sales to these companies. (Trial Transcript pp. 199-204, 8/12/14; Plaintiff's Exhibits 35, 55.)

## Conclusions of Law

### Fisher was an employee of PMG, not an independent contractor.

38. The Pennsylvania Supreme Court provides the following test to determine whether a worker is an employee or an independent contractor working with an owner. The Court states that the factors to be considered are

> Control of the manner work is to be done; responsibility for result only; terms of agreement between the parties; the nature of the work or occupation; skill required for performance; whether one is engaged in a distinct occupation or business; which party supplied the tools; whether payment is by time or by the job; whether work is part of the regular business of the employer; and also the right to terminate the employment at any time."[1]

39. Further, "[w]hile all of these factors are important indicators, the key element is whether the alleged employer has the *right* to control the work to be done and the manner in which it was

---

[1] Hammermill Paper Co. v. Rust Engineering Co., 430 Pa. 365, 370, 243 A. 3d. 389, 392 (1968) (internal citations omitted).

7

performed. If the alleged employer has this right, an employer-employee relationship likely exists."[2]

40. During the time that Fisher worked for PMG, he participated in the regular business of the company, using equipment and office space provided by the company. His time and manner of work was controlled by his superiors at PMG, and his work there was at-will. Most definitively, he held himself out as an employee of PMG in his interactions with customers. The totality of the circumstances shows that Fisher was an employee of PMG.

**Fisher is liable to PMG for tortious interference with contract.**

41. In Pennsylvania,

> "[t]he elements of a cause of action for intentional interference with a contractual relation, whether existing or prospective, are as follows: (1) the existence of a contractual, or prospective contractual relation between the complainant and a third party;(2) purposeful action on the part of the defendant, specifically intended to harm the existing relation, or to prevent a prospective relation from occurring; (3) the absence of privilege or justification on the part of the defendant; and (4) the occasioning of actual legal damage as a result of the defendant's conduct.[3]

42. Plaintiff has provided overwhelming evidence that Fisher diverted PMG's customers away from PMG in favor of doing business with Able directly, to his own benefit. Fisher did so deliberately, in violation of the employee non-competition agreement, and without justification. Actual legal damage, in the form of lost sales to PMG, was the result. Accordingly, Fisher is liable for tortious interference.

---

[2] Carbaugh v. W.C.A.B. (Knight's Home Improvements), No. 1915 C.D. 2009, 2010 WL 9514444, at *1 (Pa. Commw. Ct. Apr. 13, 2010).

[3] Strickland v. Univ. of Scranton, 700 A.2d 979, 985 (Pa. Super. Ct. 1997) (internal citations omitted).

8

**Fisher is liable to PMG for breach of contract.**

43.    The Corporate Policy Acknowledgement signed by Fisher in 2009 (Plaintiff's Exhibit 2) was a valid contract. For a restrictive covenant to be enforceable, there must be consideration.[4] Fisher's employment with PMG began in October 2009, and he signed the Acknowledgement on October 16, 2009. This is substantially simultaneous to the beginning of his employment with PMG, such that employment constitutes valid consideration. Accordingly, the contract is enforceable.

**Fisher is liable for theft of trade secrets, but not for conversion.**

44.    In order to prove theft of trade secrets, a party must show:

(1) that there was a trade secret ...; (2) that it was of value to employer and important in the conduct of his business; (3) that by reason of discovery of ownership the employer had the right to the use and enjoyment of the secret; and (4) that the secret was communicated to the employee while he was in a position of trust and confidence under such circumstances as to make it inequitable and unjust for him to disclose it to others, or to make use of it himself, to the prejudice of his employer.[5]

45.    The Corporate Policy Acknowledgement signed by Fisher shows that PMG considered its customer and dealer lists confidential, and that Fisher was aware of this. "Where a business has permanent and exclusive relationships between customers and salespersons, and the customer lists compiled by the firm represent a material investment of the firm's time and money, a customer list is in the nature of a trade secret."[6]

---

[4] Shepherd v. Pittsburgh Glass Works, LLC, 2011 PA Super 156, 25 A.3d 1233, 1242 (2011).

[5] O.D. Anderson, Inc. v. Cricks, 2003 PA Super 13, ¶ 30, 815 A.2d 1063, 1072 (2003)

[6] Mountbatten Sur. Co. v. AFNY, Inc., No. CIV. A. 99-2687, 2000 WL 375259, at *15 (E.D. Pa. Apr. 11, 2000) aff'd, 55 F. App'x 80 (3d Cir. 2003) (internal citations omitted).

46.     Despite this, Fisher took customer information from PMG, which was developed by PMG, and to which he had access because of his employment and which was integral to PMG's business. He did this without PMG's knowledge or consent (indeed, he took steps to conceal his actions from his employer). He left PMG with customer lists and contact information, and used them for his own and Able's benefit, and to the prejudice of PMG. Accordingly, Fisher is liable for theft of trade secrets.

47.     However, "[a] conversion is the deprivation of another's right of property in, or use or possession of, a chattel, or other interference therewith, without the owner's consent and without lawful justification."[7]

48.     Plaintiff alleges that Fisher converted sales. However, as sales are not chattel, and Fisher did not interfere with the possession or use of any chattel belonging to PMG, the Court cannot find him liable for conversion.

### Compensatory Damages

49.     In calculating damages, reasonable certainty is required. "Because damages in the nature of lost profits are difficult to establish with mathematical certainty, only reasonable certainty will be required....Often the reasonable certainty required may be fulfilled by looking to a restitutionary measure of damages."[8]

50.     In this matter, PMG has not proven the value of the lost profits from Fisher's diverted sales with reasonable certainty. Accordingly, the Court awards damages in the measure of the commissions Fisher received from his illicit sales as demonstrated in Plaintiff's Exhibits 35, 36,

---

[7] Stevenson v. Econ. Bank of Ambridge, 413 Pa. 442, 451, 197 A.2d 721, 726 (1964)

[8] Scobell Inc. v. Schade, 455 Pa. Super. 414, 421-22, 688 A.2d 715, 719 (1997) (internal citations omitted).

10

37, 38, and 44. This represents a restitution of the amount by which Fisher was unjustly enriched by his diverted sales.

51.    The Court does not include the commissions for the sales listed in Exhibit 39, to Computer Mechanics On Call (CMOC), nor the sales made between May 31, 2013 and May 31, 2014. In the case of the CMOC sales, the Court was not sufficiently persuaded that Fisher was responsible for the loss of these sales. In the case of the sales after May 31, 2013, Plaintiff bases its damages on Fisher's uncorroborated statement that he was doing $5 million of business per month. This is simply too speculative for the Court to award the requested damages.

52.    Plaintiff PMG is awarded compensatory damages in the measure of $542,185.42, together with pre- and post-judgment interest.

**PMG is entitled to punitive damages.**

53.    "[P]unitive damages are awarded to punish a defendant for certain outrageous acts and to deter him or others from engaging in similar conduct." However, "a court may not award punitive damages merely because a tort has been committed. Additional evidence must demonstrate wilful, malicious, wanton, reckless or oppressive conduct."[9]

54.    Fisher's theft of trade secrets and tortious interference were committed intentionally, with malicious or reckless disregard for the rights of PMG. Accordingly, punitive damages are warranted. However, although the decision whether or not to award punitive damages is within the discretion of the trial court, "a reasonable relationship must still exist between the nature of

---

[9] Delahanty v. First Pennsylvania Bank, N.A., 318 Pa. Super. 90, 130, 464 A.2d 1243, 1263 (1983).

11

the cause of action underlying the compensatory award and the decision to grant punitive damages."[10]

55. The Court finds that Fisher's conduct was sufficiently egregious as to warrant punitive damages in the amount of $50,000.

56. Plaintiff's request for an accounting is denied, as Plaintiff has had ample opportunity in discovery to determine its damages.

BY THE COURT:

GLAZER, J.

---

[10]Judge Technical Servs., Inc. v. Clancy, 2002 PA Super 391, ¶ 16, 813 A.2
d 879, 888 (2002) (internal citations omitted).

12

THE COURT OF COMMON PLEAS OF PHILADELPHIA COUNTY
FIRST JUDICIAL DISTRICT OF PENNSYLVANIA
CIVIL TRIAL DIVISION

| | |
|---|---|
| IT'S ALL WIRELESS, INC.<br>Trading as PRO MOBILE GEAR,<br>     Plaintiff, | JUNE TERM, 2012 |
| v. | No. 3874 |
| ABLE PLANET, INCORPORATED,<br>API DIRECT, LLC,<br>CERTIFIED ELECTRONICS, LLC,<br>KEVIN SEMCKEN,<br>   and<br>DAVID FISHER,<br>     Defendants. | Commerce Program<br><br>Control Numbers: 15020463 and 15022076 |

**DOCKETED**

APR 1 7 2015

R. POSTELL
COMMERCE PROGRAM

**ORDER**

**AND NOW,** this 17th day of April, 2015, upon the parties' cross-motions for post-trial relief, the responses thereto, and the memoranda in support and in opposition, it is **ORDERED** as follows:

1. Defendant's post-trial motion is DENIED.

2. Plaintiff's post-trial motion is GRANTED.

3. A hearing on plaintiff's request for attorneys' fees will be held on Wednesday, May 6, 2015, at 10:00 am in Courtroom 650, City Hall, Philadelphia.

**BY THE COURT:**

It'S All Wireless, Inc.-ORDOP

12060387400216

GLAZER, J.

1

COPIES SENT PURSUANT TO Pa.R.C.P. 236(b)  R. POSTELL 04/20/2015

## THE COURT OF COMMON PLEAS OF PHILADELPHIA COUNTY
## FIRST JUDICIAL DISTRICT OF PENNSYLVANIA
## CIVIL TRIAL DIVISION

| | | |
|---|---|---|
| IT'S ALL WIRELESS, INC. | : | JUNE TERM, 2012 |
| Trading as PRO MOBILE GEAR, | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | No. 3874 |
| | : | |
| ABLE PLANET, INCORPORATED, | : | |
| API DIRECT, LLC, | : | |
| CERTIFIED ELECTRONICS, LLC, | : | |
| KEVIN SEMCKEN, | : | Commerce Program |
| and | : | |
| DAVID FISHER, | : | |
| Defendants. | : | Control Numbers: 15020463 and 15022076 |
| | : | |

## OPINION

### I. Introduction.

These post-trial motions have been filed by both the plaintiff, It's All Wireless/Pro Mobile Gear ("PMG") and the non-settling defendant, David Fisher ("Fisher"). Fisher filed a motion containing requests for a new trial and/or for judgment notwithstanding the verdict, and to mold the verdict. PMG filed a motion for attorneys' fees. Upon consideration of the motions and responses, the court grants PMG's motion and denies Fisher's motion.

### II. Discussion.

**a. Fisher's request that the judgment be molded to reflect the settlement with the Able Planet defendants is DENIED.**

Fisher argues that the judgment awarded to PMG should be molded to reflect the settlement entered into between PMG and the Able Planet defendants. However, it does not

2

appear to the court that the Fisher met his burden at trial to show that he is entitled to the set-off requested.

Fisher argues that the Uniform Contribution Among Tortfeasors Act, as well as the common law, requires that the judgment against Fisher be reduced by an amount proportional to the settlement with the Able Planet defendants.[1] However, the Able Planet defendants, who settled prior to trial, were not joint tortfeasors with Fisher – PMG's claims against them were not identical, and the damages were not identical to those claimed against Fisher.[2] Moreover, Fisher did not make any counterclaims for contribution or indemnity against the Able Planet defendants.

The measure of damages awarded by the court to PMG did *not* reflect what the Able Planet defendants settled for, nor what they would have owed PMG had they been found to be joint tortfeasors. Rather, the court required Fisher to pay PMG the amount of the commission he received from the wrongfully diverted sales. This was a benefit that only Fisher received, and any judgment owed by the Able Planet defendants would not serve as a set-off.

For the same reason, Fisher's request for the judgment to be reduced by 35 percent is denied. This judgment does not represent the harm jointly done to PMG by Fisher and the Able Planet defendants, but the wrongfully-received benefit to Fisher alone. While a more appropriate measure of damages might have been PMG's lost profits, there was insufficient evidence in the record to calculate its lost profits with reasonable certainty. Therefore, the court awarded PMG the readily ascertainable amount of the commissions earned by Fisher.

---

[1] 42 Pa. C.S. §§ 8326.

[2] "Joint tortfeasors exist where 'two or more persons owe to any other the same duty and by their common neglect, such other is injured.'" LaZar v. RUR Indus., Inc., 337 Pa. Super. 445, 450, 487 A.2d 29, 32 (1985) (internal citations omitted).

3

**b. PMG's request for attorneys' fees is granted.**

The court found that the Corporate Policy Acknowledgement signed by Fisher in 2009 was a valid and enforceable contract, and that Fisher breached that contract. That document includes the clear statement that "[i]t is specifically acknowledged and agreed to by Employee that the Company has the right to seek and obtain proper and equitable injunctive relief and/or damages for violation of this non-compete covenant and Employee will be responsible for all attorneys' fees and costs related to this injunctive relief or any other legal action." Accordingly, the court will hear evidence as to the reasonableness of the requested fees.

BY THE COURT:

GLAZER, J.

4